UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ERIC BLACKMAN | No. 20 CR 412<br><br>Judge Robert W. Gettleman |

## <u>GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS</u>

On December 22, 2019, 13 individuals were shot in a mass shooting at a residence on the south side of Chicago. Approximately 31 expended cartridge casings were recovered from inside of the residence. Thirteen of those expended cartridge cases came from a firearm that defendant ERIC BLACKMAN illegally straw purchased for someone else.

The straw purchaser plays a significant role in the gun violence that has continuously troubled the City of Chicago and threatened the public safety of its residents. The straw purchaser has no criminal history. An individual who cannot legally possess firearms or who does not want to be associated with a firearms sale takes advantage of this fact and uses the straw purchaser to be the face of a firearm transaction. Both the straw purchaser and the prohibited person deceive the firearms dealer by concealing the identity of the true buyer of the firearm, which results in frustrating law enforcement's efforts to investigate serious crimes traced to that purchased firearm. It is the straw purchaser who sets in motion a chain of events that has the potential to endanger the community.

1

Such was the case here when defendant straw-purchased the Smith and Wesson 9 millimeter pistol that played such a significant role in the December 2019 shooting that injured so many people.

Defendant was charged with, and pled guilty to, straw-purchasing that Sith and Wesson firearm, in violation of 18 U.S.C. § 922(a)(6). Defendant's offense is a serious one. In light of defendant's specific history and characteristics and the principles of sentencing set forth in 18 U.S.C. § 3553(a), a sentence at the high end of the Guidelines range of 6 to 12 months is an appropriate and just sentence in this case. Such a sentence is sufficient but not greater than necessary to satisfy the goals set forth in the Sentencing Guidelines and § 3553(a).

## I.    Factual Background[1]

On August 10, 2019, defendant purchased a 9 millimeter Smith and Wesson pistol from a licensed firearms dealer in Oak Forest, Illinois. In connection with the purchase of that pistol, defendant completed an ATF Form 4473. When defendant completed that form, he certified that he was the actual buyer of the Smith and Wesson pistol. At the time that defendant so certified, he, in fact, knew that he was not purchasing the gun for himself but was rather doing so on behalf of another person, namely Individual A.

---

[1] The information contained in this section is based on the complaint, R. 1, and the Presentence Investigation Report ("PSR"), which contains the Government's Version of the Offense ("GVO"). At sentencing, the district court may rely upon information contained in a PSR so long as the information is well-supported and appears reliable. *See United States v. Salinas*, 365 F.3d 582, 587 (7th Cir. 2004).

On August 4, 2020, ATF agents interviewed defendant who admitted that he purchased the firearm for Individual A because Individual A was underage and could not purchase a gun himself.[2] PSR ¶ 6; *see* GVO, Exh. A, ATF Report No. 7 at 1-2. Text messages between defendant and Individual A, which were recovered from defendant's phone, show that defendant's intent from the outset was to purchase a gun for another person and to lie on the ATF Form 4473 where he claimed to be the actual buyer of the firearm. During the text exchanges, defendant and Individual A discussed defendant's purchase of the firearm for Individual A. PSR ¶ 6. Specifically, defendant told Individual A, "give me your cash, I'll go buy you one [firearm] brand new." R. 1 at 4. Individual A asked defendant if he could get "good ones [firearms]" for $400, and defendant responded, "guns is guns but yeah you can get some for $400." On July 25, 2019, Individual A confirmed with defendant that he could still purchase the gun for Individual A ["I was still tryna buy that [firearm] [t]omorrow[.] [Y]ou still got me?" Defendant confirmed that he did ["Yeah I got you"]. Defendant and Individual A made plans to go to the gun store together, but Individual A told defendant, "if you wanted [to,] I could just give you the bread [money] and you can grab it [firearm from the gun store]. I know you know what's good and what's not anyway." After defendant purchased this firearm, he gave it to Individual A.

---

[2] ATF agents previously interviewed defendant on January 28, 2020. *See* GVO, Exh. A at ATF Report No. 4 at 2-5. During that interview, defendant told agents that he left the Smith and Wesson firearm with Individual A at Individual A's residence for safe-keeping. Defendant admitted in his August 4, 2020 interview with agents that he lied to them about what happened to the firearm after he purchased it. *See* GVO, Exh. A at ATF Report No. 7 at 2.

Individual A then gave defendant $400. *See* GVO, Exh. A, ATF Report No. 7 at 2. When agents asked defendant during the interview for his thoughts on providing Individual A with the firearm that defendant purchased, defendant responded, "I just figured what's the worst that could happen?" *Id.*

Law enforcement recovered the firearm from Individual A on or about December 30, 2019. PSR ¶ 5; *see* GVO, Exh. B. According to police reports from that incident, Chicago Police Department officers observed Individual A walking with what appeared to be the handle of a gun sticking out from his right coat pocket. GVO, Exh. B. Officers attempted to stop Individual A when he began running down the sidewalk. *Id.* Officers apprehended Individual A and recovered from him the Smith and Wesson that defendant bought for him. *Id.* The firearm was loaded and had an obliterated serial number when officers recovered it from Individual A. *Id.* Individual A was subsequently charged with and convicted of aggravated unlawful use of a weapon. PSR ¶ 5.

After law enforcement recovered the firearm from Individual A, they determined that it was a firearm that had been used in the December 22, 2019 mass shooting. *See* GVO, Exh. C.

## II.     Guidelines Calculation and Sentencing Range

As a matter of process, the Court must properly calculate the Guidelines range, treat the Guidelines as advisory, consider the section 3553(a) factors, and adequately explain the chosen sentence. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007).

**A. Offense Level Calculation and Criminal History Calculation**

The PSR agrees with the calculations set forth in the plea agreement. PSR ¶ 55. In the plea agreement, the base offense level is 12 pursuant to Guideline § 2K2.1(a)(7). PSR ¶ 11. After a two-level reduction for acceptance of responsibility, defendant's total offense level is 10.[3] PSR ¶¶ 18-19.

Defendant has 0 criminal history points, placing him in criminal history category I. PSR ¶ 24.

**B. Guidelines Range**

When an adjusted offense level of 10 is considered with his placement in Criminal History Category I, defendant's advisory Guidelines range is 6 to 12 months' imprisonment. PSR ¶ 54.

**III. Application Of The Section 3553(a) Sentencing Factors**

A sentence at the high end of the Guidelines range is reasonable and appropriate in this case because the § 3553(a) factors weigh in favor of such a sentence. In determining the sentence to impose, courts consider, among other factors, the nature and circumstances of the offense and the history and

---

[3] The PSR notes that defendant failed to return to the probation officer completed and signed financial forms and release forms as directed. PSR ¶¶ 9, 18, 51. The PSR also notes that defendant failed to respond to the probation officer's follow-up attempt to obtain these forms. PSR ¶ 9. The PSR notes, however, that defendant's admission to investigating agents and his timely guilty plea "outweigh" his failure to return the requisite forms to the probation officer. PSR ¶ 18.

characteristics of the defendant. 18 U.S.C. § 3553(a)(1).[4]

There are several § 3553(a) factors that support such a sentence for this defendant, including: (1) his history and personal characteristics, (2) the seriousness of the offense, (3) the need to provide just punishment for the offense and adequate deterrence, and (4) the need to protect the public from further crimes of the defendant. The government's proposed sentence adequately addresses these factors and appropriately provides a just sentence for this defendant.

## A. History and Characteristics of the Defendant[5]

Defendant is 30 years old. PSR ¶ 35. Defendant has no prior criminal history. PSR ¶¶ 22-24. Defendant reported to the probation officer that he was raised by his single mother on the south side of Chicago, that his childhood was "great," that his mother gave him "anything he wanted," and that while he did not speak with his siblings on a frequent basis, he had a close relationship with them. PSR ¶¶ 30-31. Defendant denied any gang affiliation. PSR ¶ 34. Defendant reported being in a long-term and stable relationship with his girlfriend and that he had no children. PSR ¶

---

[4] Courts also must consider the need for the sentence to (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D); *see also e.g., United States v. Vallar*, 635 F.3d 271, 278 (7th Cir. 2011). Section 3553(a) also requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.

[5] The PSR notes that the probation officer was unable to corroborate this information with defendant's brother. PSR ¶ 29.

32. Defendant reported an employment history to the probation officer, though the officer was unable to verify certain of this self-reported employment because defendant did return a signed release of information form.[6] PSR ¶¶ 45-49.

Unlike many of the defendants in this District, defendant does not have a criminal history, and he had a solid upbringing. On the one hand, while the Court can consider defendant's lack of criminal history as a mitigating factor, the Court should also weigh it as an aggravating factor for his lack of criminal history is what allowed him to commit the straw-purchasing offense.

### B.   Seriousness of the Offense

The nature of defendant's offense is undoubtedly serious. The Supreme Court has explained the "twin goals" of section 922(a)(6) and identified the difficulties law enforcement face during investigations of serious firearms crimes when straw-purchasers at the front end mask the identity of the firearm's true purchaser:

> [T]he statute establishes an elaborate system to verify a would-be gun purchaser's identity and check on his background. It also requires that the information so gathered go into a dealer's permanent records. The twin goals of this comprehensive scheme are to keep guns out of the hands of criminals and others who should not have them, and to assist law enforcement authorities in investigating serious crimes. And no part of that scheme would work if the statute turned a blind eye to straw purchases—if, in other words, the law addressed not the substance of a transaction, but only empty formalities.

> To see why, consider what happens in a typical straw purchase. A felon or other person who cannot buy or own a gun still wants to obtain one. (Or, alternatively, a person who could legally buy a firearm wants to conceal his purchase, maybe so he can use the gun for criminal purposes

---

[6] The government notes that during its investigation, it learned that defendant was employed at the food retailer referenced in paragraph 47 of the PSR.

without fear that police officers will later trace it to him.) Accordingly, the prospective buyer enlists an intermediary to help him accomplish his illegal aim. Perhaps he conscripts a loyal friend or family member; perhaps more often, he hires a stranger to purchase the gun for a price. The actual purchaser might even accompany the straw to the gun shop, instruct him which firearm to buy, give him the money to pay at the counter, and take possession as they walk out the door.

\*\*\*

And likewise, the statute's record-keeping provisions would serve little purpose if the records kept were of nominal rather than real buyers . . . That information helps to fight serious crime. When police officers retrieve a gun at a crime scene, they can trace it to the buyer and consider him as a suspect. Too, the required records enable dealers to identify certain suspicious purchasing trends, which they then must report to federal authorities. But once again, those provisions can serve their objective only if the records point to the person who took actual control of the gun(s). Otherwise, the police will at most learn the identity of an intermediary, who could not have been responsible for the gun's use and might know next to nothing about the actual buyer.

*Abramski v. United States*, 573 U.S. 169, 181-83 (2014) (internal citations and parantheticals omitted).

Here, defendant purchased the gun for Individual A and knowingly (falsely) certified that the gun was for him when it was, in fact, for Individual A. By concealing that Individual A was the actual buyer, defendant "prevented the dealer from transacting with [Individual A] face-to-face, recording his name, age, and residence, inspecting his photo ID, submitting his identifying information to the background check system, and determining whether he was prohibited from receiving a firearm," *id.* at 188 (internal citations omitted), conduct that "thwarted application of essentially all of the firearms law's requirements," *id.* at 188-89.

8

The devastating impact of prohibited persons illegally possessing firearms on a community cannot be overstated. Firearms and firearm-related violence have plagued the City of Chicago for years.[7] The City of Chicago has been inundated with violence from the actions of individuals who illegally possess firearms and then use those firearms to commit crimes. Those individuals present a clear and present danger to the residents of the City of Chicago and undoubtedly pose a serious risk and threat of violence to the community. The residents of the City of Chicago have borne and continue to bear the brunt of the physical and emotional toll from that gun violence. Violence in Chicago neighborhoods negatively impacts quality of life, and it causes serious damage to those who live in daily fear of how that violence can impact their families and neighborhoods.

Those who straw purchase firearms and deliver them into the hands of individuals who are either unwilling or unable to purchase firearms within the boundaries of the law are inextricably linked to the gun violence that follows the transfer of those firearms. Straw purchasers contribute to the potential violence in Chicago that could result from firearms ending up in the hands of those who should not possess them.

This case is representative of the harmful ripple effect that straw-purchased firearms can have. The Smith and Wesson firearm that defendant purchased for, and transferred to, Individual A was purchased on August 10, 2019. It was used

---

7 *See, e.g.* https://abc7chicago.com/straw-purchases-fuel-chicago-gun-violence-drug-cartel-mayhem/5690949/ (last visited on July 12, 2021).

approximately four months later in the December 22, 2019 mass shooting where 13 individuals were shot. *See* GVO, Exh. C. A little over one week later, Chicago police officers recovered the firearm—loaded and with an obliterated serial number—from Individual A after Individual A fled from police.

Defendant's purchase of that Smith and Wesson set in motion a chain of events which endangered the health, safety, and welfare of the community at large, culminating in potentially deadly harm to Chicago residents and heightened danger to police officers who were trying to keep the City of Chicago safe. A sentence at the high end of the Guidelines range appropriately reflects the seriousness of defendant's offense and is a fair and just punishment when considering an application of the other § 3553(a) factors.

**C.      The Need for Defendant's Sentence to Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public from Future Crimes by this Defendant**

Defendant told ATF agents during his August 4, 2020 interview that he bought the gun for Individual A because he "ain't gotta worry about nothing with him" [later explaining that he did not believe that Individual A would do anything bad with the gun]. *See* GVO, Exh. A at ATF Report No 7 at 2. While defendant did not believe that harmful consequences would follow the illegal purchase and transfer of that firearm to Individual A, he was wrong. Defendant's act of straw-purchasing the firearm for Individual A was an intentional one, and it showed disrespect for the rules governing firearms purchases and a disregard for the broader reasons those rules are in place. As the *Abramski* Court concluded, "[we] can hardly think of a misrepresentation any

10

more material to a [firearm] sale's legality." 573 U.S. at 189. The government's proposed sentence will help promote respect for the law, reinforce the underlying purposes for imposing firearms regulations, and provide a just punishment for defendant's current crime.

The sentence imposed in this case must send a message to deter others inclined to straw purchase firearms for money or other reasons and to force them to think twice before doing so. As noted above, defendant's actions are a case study in how even one straw purchaser and one illegally purchased firearm can negatively impact the Chicago community in a harmful way. *See United States v. Hatch*, 909 F.3d 872, 874-75 (7th Cir. 2018) (allowing for consideration of "locality-specific factors," including the rise in Chicago's gun violence). In addition to general deterrence, defendant must specifically be deterred from committing future crimes. A sentence at the high end of the Guidelines range is necessary to reflect the consequences that flow from this type of crime, ensure that defendant does not continue his criminal conduct, and send a message to others that an offense such as this is one that comes with serious consequences.

## IV. Supervised Release Conditions

Under 18 U.S.C. § 3583(d), a sentencing court has discretion to impose appropriate conditions of supervised release, to the extent that such conditions (1) are reasonably related to factors identified in § 3553(a), including the nature and circumstances of the offense and the history and characteristics of the defendant; (2) involve no greater deprivation of liberty than is reasonably necessary for the purposes set forth in § 3553(a); and (3) are consistent with the policy statements issued by the Sentencing Commission. Policies emphasized by the Sentencing

Commission include deterrence rehabilitation, and protecting the public.

*United States v. Armour*, 804 F.3d 859, 867 (7th Cir. 2015) (internal quotation marks omitted). In *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), the Seventh Circuit held that sentencing courts must make an independent determination that each condition of supervised release imposed on a defendant is rationally and reasonably related to the offense conduct and characteristics, and to the sentencing purposes identified by 18 U.S.C. §§ 3583(c) and 3553(a)(1), (a)(2)(C), and (a)(2)(D). *Thompson*, 777 F.3d at 374-76.

Consistent with these principles, the government recommends that the Court impose a three-year period of supervised release. The government agrees with the probation officer that the mandatory, discretionary, and special conditions of supervised release recommended in the PSR are reasonable and appropriate to protect the public and the supervising probation officer, deter defendant from returning to criminal conduct and promote his respect for the law, and ensure that defendant receives the appropriate support for him to reintegrate into society. PSR at 12-17.

## V.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence at the high end of the Guidelines range and order a three-year term of supervised release with the requested supervised release conditions consistent with the goals of criminal punishment.

Date: July 12, 2021

Respectfully Submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    */s/ Sheri L. Wong*
Sheri L. Wong
Assistant U.S. Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 697-4069